# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBIN L. WIESSMANN, | : |
|                Plaintiff, | :   CIVIL ACTION |
| v. | : |
| NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, | :   NO. 16-6261 |
|                Defendant. | : |

**Goldberg, J.**                                                                                                                                                                   May 22, 2018

## MEMORANDUM

Plaintiff Robin Wiessmann has sued Defendant Northwestern Mutual Life Insurance Company ("Northwestern") based on its refusal to pay benefits under a disability insurance policy. Following the Rule 12(b)(6) dismissal of the original Complaint without prejudice, Plaintiff filed an Amended Complaint on September 18, 2017. Defendant has now moved to dismiss the Amended Complaint in its entirety. For the following reasons, I will grant the motion in part and deny it in part.

## I.    FACTS IN THE AMENDED COMPLAINT

The following facts are taken from Plaintiff's Amended Complaint:[1]

Plaintiff is the owner and beneficiary of a disability income insurance policy (the "Policy") issued by Defendant Northwestern on December 28, 1989. The Policy has been and remains in

---

[1] When determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009). In accordance with this principle, my recitation of the facts assumes the truth of the factual statements in the Amended Complaint.

full force and effect up through at least the date of filing the Amended Complaint. The Policy provides for payment of benefits for total disability in the event Plaintiff is unable to perform one or more of the principal duties of her occupation, or for partial disability in the event she faces at least a 20% loss of time spent at her occupation. (Am. Compl. ¶¶ 7–9.)

At all relevant times, Plaintiff was employed, or in pursuit of employment, within her occupation as a high-level financial services executive. From 2007 to January 2009, she served as Treasurer of the Commonwealth of Pennsylvania, acting as the sole fiduciary for the Commonwealth's $22 million assets and overseeing the day-to-day management of those assets. Her principal duties included: overseeing a team that managed substantial financial assets and the cash flow associated with them, largely through face-to-face interactions; spending significant periods of time sitting at a desk or table while conducting such interactions, performing sophisticated financial analysis, or conducting conference calls; significant amounts of travel by plane, train, and car, both in and outside of the Commonwealth; physically attending and sitting for frequent meetings with those she supervised and others; and putting in fifty to sixty hours of work weekly. (Id. ¶¶ 10–13.)

In May 2008, Plaintiff came under medical care for both diverticulitis and lumbar disc disease. Despite the increasing severity of these conditions, Plaintiff finished her term as the Pennsylvania Treasurer. After her term ended, Plaintiff expected to be able to move to a similarly high level position in her occupation, but that proved to be impossible due to her medical conditions, which caused excruciating physical pain and left her physically exhausted. As a result, she could not engage in any extensive job interviewing. Although she was able to complete one interview, she had to refuse this corporate position because she could not perform its principal duties, which were similar to her Treasurer position. On most days, Plaintiff was in so much pain that she could not leave her bed or bathe. (Id. ¶¶ 15– 24.)

During her term as Treasurer, Plaintiff sat on the Board of Directors of the Vantage Fund. Sitting on such boards was necessary and valuable to Plaintiff for purposes of professional networking and the board position placed few physical and time demands on her. Thus, despite her medical limitations, she was able to fulfill her board responsibilities. Even after she completed her term as Treasurer, Plaintiff decided to continue on the Vantage Fund board and, subsequently, to add a board position with Met Pro. (Id. ¶¶ 25–27, 29.)

In the January 2009 to January 2010 time period, Plaintiff continued to be treated for diverticulitis and lumbar disc disease, without improvement. She put herself on a special diet to reduce her stomach inflammation. From January 2010 to January 2015, Plaintiff's diverticulitis slowly improved and, due to extensive physical therapy, her symptoms from the lumbar disc disease improved. Nonetheless, she remained unable to sit for long periods of time at a desk or at meetings, to travel frequently, or to work more than 60–75% of the 50–60 hour work weeks. (Id. ¶¶ 30–33.)

In June 2014, Plaintiff submitted a claim and proof of disability to Defendant, seeking benefits under the Policy for periods of both total disability and partial disability. She provided Defendant with a statement of the nature and extent of her disability. (Id. ¶ 40.) On December 19, 2014, Defendant sent Plaintiff a list of "requirements" for receiving disability benefits. Approximately six months later, on June 30, 2015, Defendant notified Plaintiff that her claims for partial and total disability were denied. Despite her submission of additional information, Defendant continued to deny Plaintiff's disability claims through two appeals, up to and including November 24, 2015. Defendant asserted that, after January 2009, Plaintiff's occupation was a "board member." (Id. ¶¶ 44, 46, 48, 49.)

Plaintiff initiated suit in this Court on December 1, 2016. I dismissed her original Complaint under Federal Rule of Civil Procedure 12(b)(6), but granted leave to amend. Plaintiff

3

filed her Amended Complaint on September 18, 2017, alleging claims for breach of contract (Count I), bad faith (Count II), and for a declaratory judgment (Count III). Defendant filed a second Motion to Dismiss on October 10, 2017, and Plaintiff responded to that Motion on October 27, 2017.

**II. STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.

The United States Court of Appeals for the Third Circuit has detailed a three-step process to determine whether a complaint meets the pleadings standard. Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014). First, the court outlines the elements a plaintiff must plead to state a claim for relief. Id. at 365. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." Id. Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 679). The last step is "a context-

specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (quoting Iqbal, 556 U.S. at 679).

## III. DISCUSSION

### A. **Count I – Breach of Contract**

Count I of the Amended Complaint alleges that Plaintiff was totally disabled from January 21, 2009 to January of 2010, and partially disabled from January 1, 2010 to January 1, 2015, but was improperly denied benefits under the Policy.[2] Defendant moves to dismiss this breach of contract claim, contending that the Amended Complaint fails to allege facts establishing either a "Total Disability" or "Partial Disability" as defined in the Policy. Addressing each of Defendant's arguments in support of its Motion, I find no basis for dismissal of this claim.

#### 1. Total Disability

The Amended Complaint first contends that Plaintiff suffered a "Total Disability" from January 21, 2009 to January of 2010. The Policy defines "Total Disability" as follows:

> Until the end of the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation. After the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation and is not gainfully employed in any occupation.

(Policy § 1.2.)

In support of her "Total Disability" claim, Plaintiff asserts that after her term as Treasurer ended on January 20, 2009, she could not interview for positions in her occupation due to her medical conditions. Specifically, she alleges that:

> As a result [of her medical conditions], Wiessmann could not engage in any extensive job interviewing, although she attempted to do so. Wiessman was able to complete only a single interview for one corporation position, but had to refuse the position because she could

---

[2] The Policy provides benefits, "when the Insured is totally or partially disabled." (Am. Compl., Ex. A ("Policy"), § 1.1.)

> not perform its principal duties: being the upper level, day-to-day prime mover for a team accomplishing important financial work; sitting at a desk or table for extended periods of time to engage in face-to-face interactions, sophisticated financial analysis, or conference calls; engaging in significant amounts of travel; physically attending and sitting for frequent meetings; engaging in public speaking; and working for 50–60 hours per week.

(Am. Comp. ¶ 23.)

Relying on Plaintiff's status as a member of several Boards of Directors, Defendant argues that this allegation fails to meet the definition of "Total Disability" on two grounds: (1) she does not meet the Policy's requirement of total lack of "gainful employment in any occupation" and (2) she failed to assert that she could not perform the principal duties of her "occupation" for the alleged period of total disability because she served as a board member for Vantage Fund and Met Pro, both of which were "occupations" that compensated her.

Neither of these arguments provides a basis for dismissal of Count I. Defendant's first argument—that the Policy requires the insured to be "not gainfully employed in any occupation"—ignores pertinent policy language. Under the "Total Disability" provision, the "not gainfully employed in any occupation" requirement is only relevant after the end of the Initial Period. According to the Policy, the "Initial Period" is "the period of time that starts on the Beginning Date and continues, while the insured is disabled, for the length of time shown on page 3 [of the Policy]." (Policy § 1.2.) Page 3 of the Policy explains that Plaintiff's "Initial Period" extends "[t]o December 28, 2018, but not less than 24 months of benefits." (Policy at p. 3.) As December 28, 2018 has yet to arrive, Plaintiff need not establish that she was not "gainfully employed in any occupation" in order to be eligible for total disability benefits.

Defendant's second argument—that Plaintiff's board directorships were an "occupation" in which she engaged for compensation during the period of Total Disability—is premature at this stage of the litigation. The Policy definition of "occupation" states that "[t]he words 'his

occupation' mean the occupation of the Insured at the time he becomes disabled. If the Insured is regularly engaged in more than one occupation, all of the occupations of the Insured at the time he becomes disabled will be combined together to be 'his occupation.'" (Policy at § 1.1.) This language does not clarify what precisely is an "occupation." For example, it does not indicate whether a certain income level or number of hours is required at a job in order for it to qualify as an "occupation." Nor does it state—as Defendant suggests—that any job wherein one is "gainfully employed" constitutes an "occupation" for purposes of coverage. Rather, it is equally reasonable to interpret "occupation" to mean—as Plaintiff posits—a profession. If a provision in an insurance policy is ambiguous, it must be construed in favor of the insured and against the insurer. J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 363 (3d Cir. 2004).

The Amended Complaint alleges that Plaintiff's occupation was as a "high-level financial services executive" and that she had worked in this occupation at Goldman Sachs, Artemis Capital, Merrill Lynch, and at the Commonwealth of Pennsylvania Department of the Treasury. (Id. ¶¶ 10–11.) It goes on to plead that sitting on boards "was neither her occupation, or a part of her occupation," but rather "was necessary and valuable to Plaintiff for reasons of professional networking, an extra-curricular focus of all successful high-level executives." (Id. ¶ 25.) Plaintiff further asserts that:

> Sitting on such boards placed few physical and time demands on executives compared to their networking advantages. Generally, instead of day-to-day efforts, board positions involve shared responsibility, exercised on a quarterly basis, through limited reading and infrequent telephone conference calls or computer communications, and attendance at meetings of one or two days that might occur, at most, three times a year. Board member positions are mainly advisory, and do not require the level of work performance or duties it takes to be a high-level financial services executive.
> . . .

7

> Although Wiessmann was in extreme pain, bed-ridden, and could not accomplish the principal duties of a job in her occupation, Wiessman was able to fulfill board responsibilities while in bed.

(Id. ¶¶ 26–27.)

Taking these allegations as true as I must at this stage of the litigation, I find that Plaintiff has plausibly pled that she could not perform the principal duties of her occupation. Defendant's contention that her board positions were her "occupation" under the Policy constitutes a factual issue that cannot be resolved at this early stage of the litigation.

### 2. Partial Disability

Defendant next argues that the Amended Complaint fails to plead Plaintiff's entitlement to "partial disability." Under the Policy, "Partial Disability" is when the Insured:

> Is unable to perform one or more principal duties which accounted for at least 20% of the time he spent at his occupation before the disability started; or he has at least a 20% loss of time spent at his occupation.

(Id.) Defendant contends that the Amended Complaint is deficient because it neither (a) identifies, under the first prong of this provision, any occupational duty accounting for 20% of Plaintiff's work time that she was completely unable to perform, nor (b) pleads, under the second prong of this provision, a 20% loss of time spent at her occupation.

I disagree and find that Plaintiff has adequately pled partial disability under either the first set or second set of the Policy's criteria. According to the Amended Complaint, in January 2010, Plaintiff's term as Treasurer had finished and she joined the Met Pro Board of Directors. She claims that she remained partially disabled until January 20, 2015, when she became Acting Secretary of Banking and Securities for the State of Pennsylvania. The Amended Complaint asserts:

> During the January 2010 to January 2015 time period, Wiessmann's diverticulitis slowly improved and she underwent extensive therapy

> for her lumbar disc disease. She remained partially disabled, since she was still unable to perform all of the duties of her principal occupation. She remained unable to sit for long periods of time at a desk or at meetings, to travel frequently, or to work more than 60–75% of the 50–60 hour work weeks necessitated by that occupation. She also experienced continued fatigue.

(Am. Compl. ¶ 33.)

Under the first prong of the "partial disability" provision, Plaintiff sufficiently asserts that her principal job duties as Treasurer, and any like position as a high-level financial services executive, included "spending significant periods of time sitting at a desk or table," "significant amounts of travel," and "physically attending and sitting for frequent meetings." (Am. Compl. ¶¶ 13–14.) Although Plaintiff does not identify the exact percentage of time spent on these activities, I can reasonably infer from the Amended Complaint that these activities jointly accounted for at least 20% of the time she spent at her occupation. While Defendant argues that the Amended Complaint states that Plaintiff performed many of these activities in connection with her duties as a director on various boards, thereby undercutting her claim that she was unable to engage in these activities, Plaintiff specifically asserts that the board positions are not comparable since they involve significantly less engagement in such activities. (Id. ¶ 26.)

Under the second prong of the relevant Policy provision, the Amended Complaint states that one of the principal duties of her occupation was working fifty to sixty hours per week. (Am. Compl. ¶¶ 13–14.) Plaintiff goes on to plead that her disability prevented her from working any more than 60–75% of that time. (Id. ¶ 33.) These allegations arguably plead that Plaintiff has at least a 20% loss of time spent at her occupation.[3] Accordingly, I find that Plaintiff has adequately pled a claim for partial disability.

---

[3] Defendant also argues that Plaintiff did not lose any "time spent" as a financial services executive because she was not employed in that occupation. Rather, during the time she claimed total or partial disability, she was a board member, but she does not allege any loss of time at that

### 3. Whether Count I as a Whole Fails to State a Claim

Defendant's final argument in support of its Motion to Dismiss Count I alleges that, at the time of her disability onset, Plaintiff was not working in her occupation as a high-level financial executive. Rather, Defendant urges that the Amended Complaint states that after Plaintiff completed her term as Treasurer, she was unemployed and unable to interview for a new job or to accept any such job because of her impairments. (Am. Compl. ¶¶ 19-20, 23.) Defendant contends that such pleading is more akin to a request to recover unemployment benefits rather than an attempt to gain coverage under a disability policy.

Defendant does not identify, nor can I find, anything in the Policy that requires that Plaintiff be actually working in her "occupation"—as a high-level financial services executive—at the time her disability began. Rather, the Policy simply demands proof that Plaintiff could not perform the principal duties of her occupation.

I find that Plaintiff has plausibly pled a claim for breach of the insurance policy. Accordingly, I will deny Defendant's Motion to Dismiss Count I of the Amended Complaint.[4]

### B. Count II – Bad Faith

Defendant also moves to dismiss Plaintiff's claim for bad faith. I will grant Defendant's request in part and deny it in part.

To establish bad faith under 42 Pa.C.S. § 8371, a plaintiff must demonstrate that the insurer (1) lacked a reasonable basis for denying benefits and (2) knew or recklessly disregarded its lack of a reasonable basis. Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997);

---

occupation. As set forth above, however, I cannot, at this juncture, determine whether her board of directors positions qualified as an "occupation" under the Policy.

[4] Defendant premises its Motion to Dismiss Count III, which seeks a declaratory judgment, entirely on its argument set forth with respect to Count I. As I find that Count I has been plausibly pled, I will not grant the Motion to Dismiss Count III.

Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1999). In the insurance context, bad faith denotes a "frivolous or unfounded" refusal to pay policy proceeds, which imports a dishonest purpose and a breach of a known duty, such as good faith and fair dealing. Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994) (quotations omitted). To defeat a claim of bad faith an insurer need not show that the insurer was correct; rather, an insurer must demonstrate that it had a reasonable basis for its decision to deny benefits. See Leach v. Nw. Mut. Ins. Co., No. 01–2364, 2005 WL 3533116, at *11 (W.D. Pa. Dec. 22, 2005); see also J.C. Penney Life Ins., 393 F.3d at 367 ("A reasonable basis is all that is required to defeat a claim of bad faith."). On the other hand, "an unreasonable interpretation of the policy provisions as well as a blatant misrepresentation of the facts or policy provisions will support a bad faith claim." Smith v. Allstate Ins. Co., 904 F. Supp. 2d 515, 524 (W.D. Pa. 2012) (quotations omitted).

Section 8371 also encompasses a broad range of other conduct including inadequate investigations. Rowe v. Nationwide Ins. Co., 6 F. Supp. 3d 621, 630–31 (W.D. Pa. 2014). Courts have held that an insurer must "properly investigate claims prior to refusing to pay the proceeds of the policy to its insured." Gold v. State Farm Fire & Cas. Co., 880 F. Supp. 2d 587, 597 (E.D. Pa. 2012) (quoting Bombar v. W. Am. Ins. Co., 932 A.2d 78, 92 (Pa. Super. Ct. 2007)). Bad faith may occur "when an insurance company makes an inadequate investigation or fails to perform adequate legal research concerning a coverage issue." Hamm v. Allstate Prop. & Cas. Ins. Co., 908 F. Supp. 2d 656, 672 (W.D. Pa. 2012) (quoting Coreh Constr. Co. v. Assurance Co. of Am., 64 Pa. D. & C.4th 496, 516 (Pa. Commw. Ct. 2003)). An insurer, however, need not demonstrate that its investigation resulted in the correct conclusion or that its investigation was perfect; rather it must simply show that its investigation was "sufficiently thorough to justify its decision to deny the

claim." Lincoln Benefit Life Co. v. Bowman, 221 F. Supp. 3d 617, 632–33 (E.D. Pa. 2016) (citations omitted).

The Amended Complaint premises the bad faith claim on two main theories: (1) a denial of benefits predicated either on an unreasonable interpretation of the terms and conditions of the Policy or on imposition of requirements that do not exist in the Policy; and (2) a failure to conduct a reasonable or adequate investigation into the nature and extent of either Plaintiff's physical condition or Plaintiff's occupation.

With respect to the first theory, I previously found, in ruling upon Defendant's first Motion to Dismiss, that this allegation "present[s] a factual question not properly resolved at this stage." (Order, ECF No. 11, ¶ 14 n.5.) The Amended Complaint repleads this same theory. Specifically, Plaintiff claims that Defendant denied benefits (a) based on a restrictive interpretation of the term "occupation," which is not clearly defined in the Policy and (b) under a misplaced determination that Plaintiff had to show no gainful employment in any occupation during her alleged period of disability—a condition that is expressly not required by the Policy.[5] Consistent with my prior decision, I find that this claim survives Rule 12(b)(6) scrutiny.

---

[5] Specifically, Plaintiff asserts:

> 47. The bases, as stated in [Defendant']s denial letter, do not comport with the terms, meaning or spirit of the Policy. For purposes of example . . .:
> (a) The denial letter of June 30, 2015 (page 4) refers to Plaintiff's "occupation" in a way that is contrary to the definition as it appears in Section 1.1 of the Policy;
> (b) The denial letter of June 30, 2015 (page 4) states that self-reporting is not considered proof of disability. That statement is directly contradictory. (*See* Policy, § 4.3)
> (c) The denial letter of June 30, 2015 refers to a "medical review," which is not mentioned in the Policy as a requirement or procedure that was used by the insurer to evaluate disability;
> . . .

With respect to Plaintiff's theory of unreasonable investigation, however, I again find that Plaintiff's bad faith claim cannot survive. The original Complaint alleged that Defendant purportedly failed to conduct a reasonable or adequate investigation into either the nature and extent of Plaintiff's physical condition or Plaintiff's occupation. (Compl. ¶¶ 35–36.) I previously determined that these allegations were insufficient to allege bad faith, reasoning:

> The Complaint's allegations regarding the supposedly unreasonable investigation are largely conclusory and not entitled to the presumption of truth. The Complaint alleges, without any factual support, that Northwestern "failed to conduct a reasonable or adequate investigation of the nature and extent of Plaintiff's physical condition" and Northwestern "failed to conduct a reasonable or adequate investigation of Plaintiff's occupation." . . .
>
> The Complaint also alleges that Northwestern did not <u>speak</u> with Wiessmann's doctors, employers, or family about her alleged disability. However, the Complaint does not articulate how the failure to communicate orally with these individuals rendered the investigation so deficient as to make out bad faith on the part of Northwestern.

---

> 49. Among other things, Northwestern continued to assert that, after January 2009, Wiessmann's "occupation" was as a "board member," continuing to ignore the following facts: that the Policy definition of "occupation" is vague and ambiguous and should be interpreted in favor of coverage; that Wiessmann's occupation is and was a high-level financial services executive, although her full disability prevented her from obtaining work in that occupation in 2009 through 2010 because she could not perform any of its principal duties during that period; that Wiessmann's partial disability thereafter prevented her from being able to travel frequently, physically attend and sit for frequent meetings, or work for more than 60 to 75% of the 50 to 60 hours a week required; that "board member" was never Wiessmann's occupation; and that her disability claim is not based on "part-time" board member positions, but rather on the continuing disability that prevented her from obtaining and performing some, or all, of the duties of her full-time occupation.
>    . . .
> 61. Northwestern Mutual knew of and recklessly disregarded its lack of a reasonable basis in denying Wiessmann's claims.

(Am. Compl. ¶¶ 47, 49, 61.)

13

(Order, ECF No. 11, ¶¶ 14–15.)

In her Amended Complaint, Plaintiff adds several allegations in support of her bad faith claim, including:

> 63. Northwestern Mutual also failed to conduct a reasonable or adequate investigation of Wiessmann's claim.
>
> 64. Northwestern Mutual failed to speak with business and/or work colleagues, and friends and family of Wiessmann, in order to more accurately ascertain the nature of her occupation, the principal duties involved, and the time commitment it required, as well as the difference between an occupation like Wiessmann's occupation and a networking opportunity like a board membership.
>
> 65. Northwestern Mutual failed to speak with Wiessmann's medical providers, family and/or work colleagues, in order to obtain more specific information regarding her disability and its effect on her ability to carry out duties, such as those involved in her occupation.
>
> 66. Northwestern Mutual also failed to conduct any medical examinations of Wiessmann, which would have given it a more realistic picture of her disability.

(Am. Compl. ¶¶ 63–66.)

These additional allegations fail to successfully move Plaintiff's bad faith claim from the realm of mere possibility to that of plausibility. According to the denial of benefits letter attached to the Amended Complaint, Defendant considered statements and medical records from Plaintiff's various physicians, as well as statements regarding Plaintiff's occupational duties. (Am. Compl., Ex. C.) Defendant also noted that Plaintiff failed to report her disability during the six-year period from its onset in May of 2008 to the June 2014 notice date set forth in the Amended Complaint. (Id.) This significant delay in reporting, attributable solely to Plaintiff, resulted in what Defendant described as the "unfortunate situation" where the current information did not establish disability and the passage of time precluded Defendant "from using alternate means to try to establish the

requisite proof." (Id.) Nothing in the Amended Complaint suggests that any additional investigation involving oral communications with Plaintiff's friends, family, work colleagues or medical providers would have yielded any different result. Although Defendant's investigation may not have been perfect, the allegations of the Amended Complaint do not raise a plausible inference that it was so deficient as to rise to the level of bad faith. Accordingly, I will dismiss this portion of the bad faith claim.

IV. CONCLUSION

In light of the foregoing, I will grant Defendant's Motion to Dismiss in part and deny it in part. Plaintiff's Amended Complaint plausibly alleges that Defendant's denial of disability benefits violated the terms of the Policy at issue. Moreover, Plaintiff's allegations create the reasonable inference that the Defendant's denial was premised on an unreasonable interpretation of the Policy's use of the word "occupation" and therefore rises to the level of bad faith. To the extent, however, that Plaintiff rests her bad faith claim on Defendant's alleged unreasonable investigation, I find that the Amended Complaint fails to raise an inference of bad faith.[6]

An appropriate Order follows.

---

[6] Plaintiff requests, via footnote, that she be given leave to amend her bad faith claim a second time. I decline to grant such leave. In originally dismissing this claim, I clearly delineated the deficiencies in Plaintiff's pleading. Her failure to correct such deficiencies in the Amended Complaint suggests that any further amendment will be futile. Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000).